UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| MELISSA M. BRUBAKER, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | CAUSE NO. 1:17-cv-00010-SLC |
| COMMISSIONER OF SOCIAL SECURITY, *sued as Nancy A. Berryhill, Acting Commissioner of SSA*,[1] | ) |  |
| Defendant. | ) |  |

## OPINION AND ORDER

Plaintiff Melissa M. Brubaker appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[2] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

### I. PROCEDURAL HISTORY

Brubaker applied for DIB and SSI in November 2013 alleging disability as of November 1, 2012. (DE 12 Administrative Record ("AR") 312-19). The Commissioner denied Brubaker's application initially and upon reconsideration. (AR 230-37, 240-45). After a timely request, a hearing was held on July 23, 2015, before Administrative Law Judge Stephanie Katich ("the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 15); *see* 28 U.S.C. § 636(c).

ALJ"), at which Brubaker, who was represented by counsel, and a vocational expert, Marie Kieffer (the "VE"), testified. (AR 43-93). On October 15, 2015, the ALJ rendered an unfavorable decision to Brubaker, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of light-exertional jobs in the economy, including cashier, sales attendant, and cafeteria attendant. (AR 18-29). The Appeals Council denied Brubaker's request for review (AR 1-14), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Brubaker filed a complaint with this Court on January 13, 2017, seeking relief from the Commissioner's final decision. (DE 1). Brubaker advances two arguments in this appeal, asserting that the ALJ: (1) failed to incorporate all of her mental limitations into the assigned residual functional capacity ("RFC") and the step-five hypotheticals; and (2) improperly discounted her symptom testimony. (DE 20 at 9-18).

## II.  FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Brubaker was 31 years old (AR 29, 296); had attended two years of college and had completed specialized job training in histotechnology (AR 341); and possessed past work experience as a histotechnician, phlebotomist, sales associate, waitress, factory worker, and home health care assistant (AR 342, 543).

### A.  *Brubaker's Testimony at the Hearing*

Brubaker testified as follows at the hearing:  When asked why she thought she could not work, Brubaker cited her chronic pancreatitis, which causes her to experience pain and vomiting,

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1918-page administrative record necessary to the decision.

and her bipolar disorder, which causes her to become very depressed to where she cannot get out of bed or leave home. (AR 49). Brubaker held jobs in the past despite her pancreatitis, which she has had since 2004, but the condition is worsening in that the pancreatitis attacks are occurring more frequently. (AR 50). She finds it hard to eat most of the time, and she has trouble sleeping; her anxiety about her pancreatitis then triggers her mental health issues. (AR 50, 67-68). She estimated that she sleeps just three hours a night; she was not taking any sleep aide medications. (AR 68, 71). She experiences pain throughout the day, ranging from soreness when relaxed to sharp pain during spasms. (AR 70-71).

Brubaker had not seen a specialist for her pancreatitis since 2012 due to financial concerns and a lack of health insurance. (AR 53). She was not taking any prescription medications for her pancreatitis, but seeks care from an emergency room if needed when she has an acute attack. (AR 53-54, 56). Her pancreatitis attacks are triggered by stress and eating, so she tries to avoid both; when she does eat, she consumes very small amounts of bland food. (AR 54-55). When she feels the onset of spasms, she stops eating, lies down and rests, and tries to avoid stress in order to relax her muscles; she also uses heat and takes hot baths. (AR 54-56).

Brubaker takes prescription medication for her mental health issues, including a bipolar disorder, but still feels "very nonfunctional." (AR 57). She complained of racing thoughts, constant worry, and no motivation. (AR 68-69). She stated that the medication controls her mood swings, but makes her feel numb. (AR 57-58). She had not been to a therapist in the past year due to her limited finances, but she had an appointment to start again.[4] (AR 58).

---

[4] Brubaker's mother, Karen Krinn, also testified at the hearing. Krinn added that there are some days where Brubaker is unable to function and she will stay in bed and sleep. (AR 74). Krinn has tried to get Brubaker on a schedule and to help with household chores, but Brubaker physically has been unable to do so. (AR 74-75). Brubaker gets overwhelmed if Krinn asks her to do several things, so Krinn has to ask them one at a time or put them on a list. (AR 75). Krinn reminds Brubaker of things she needs to get done. (AR 75). Krinn also testified that

## B. Summary of the Relevant Medical Evidence

In 2005, Brubaker was diagnosed with chronic pancreatitis by Dr. Glen Lehman, a specialist at the IU School of Medicine. (AR 786, 1547-1552). She had a trial of biliary stenting and biliary sphincterotomy that did not improve her pain. (AR 786). An upper endoscopic ultrasound in December 2006 showed mild chronic pancreatitis, and she underwent a successful celiac plexus block. (AR 1773-74). In 2007, Brubaker was seen three times at the University of Cincinnati by Dr. Shailendra Chauhan, a gastroenterology specialist. (AR 1730-39). Dr. Chauhan thought that Brubaker's problems were due to irritable bowel syndrome and not pancreatitis. (AR 1731). From January 2007 to May 2009, Brubaker was treated by gastroenterology specialists at Lutheran Medical Group. (AR 1553-1628).

In 2009, Brubaker returned to Dr. Lehman, who gave her three options to manage her chronic pain: pain management, a feeding tube, or a pancreas transplant. (AR 786). Brubaker chose pain management, and Dr. Lehman prescribed Creon and Vicodin. (AR 786).

In September 2009, Brubaker entered a partial hospitalization program for anxiety and depression. (AR 597-600). She was diagnosed with major depression, recurrent, severe without psychosis; and panic disorder without agoraphobia. (AR 599). She was assigned a Global Assessment of Functioning ("GAF") score of 48 upon admission and a past-year score of 65.[5]

---

Brubaker's past opiate dependence did not arise out of recreational use, but from attempting to relieve her pancreatitis symptoms. (AR 76).

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

(AR 599).

In 2010, Brubaker visited the emergency room twice for her abdominal symptoms. (AR 663, 730). Brubaker saw Dr. Steven Hatch, a pain management specialist, three times from November 2010 to February 2011. (AR 670-78). Brubaker's goal was to wean down her pain medications, and Dr. Hatch adjusted her medications at each visit. (AR 671, 674). On a 10-point scale, Brubaker rated her pain as an "eight" at her first appointment, a "six" at her second appointment, and a "four" at her third appointment. (AR 670, 673, 676).

In November 2010, Brubaker was hospitalized after her husband found her acting strangely. (AR 620-25). It was suspected that she had abused prescription medications; Brubaker was uncooperative and denied that she was abusing prescription drugs. (AR 620-21, 625). The doctor concluded that Brubaker had taken more medication than prescribed. (AR 621, 625). Brubaker was diagnosed with a depressive disorder, not otherwise specified ("NOS"); an anxiety disorder, NOS; rule out drug dependency; and rule out a drug-induced mood disorder. (AR 621).

Brubaker was hospitalized again in December 2010, admitting that she was abusing prescription narcotics and complaining of abdominal pain, suicidal thoughts, insomnia, depression, panic attacks, and anxiety. (AR 644-46). She was placed in a chemical dependency program. (AR 646). She was not working and was not able to care for her two-year-old son. (AR 645). She was assigned a GAF score of 60 and diagnosed with a depressive disorder, NOS;

---

And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id*.

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, several clinicians of record used GAF scores in assessing Brubaker, so they are relevant to the ALJ's decision. *See id*. (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

5

an anxiety disorder, NOS; drug dependence, narcotics; a drug-induced mood disorder; and a borderline personality disorder. (AR 644).

In February 2011, Brubaker saw Dr. Edward Schultz, of Parkview Physicians Group, complaining of abdominal pain, depression, diminished stamina, anorexia, confusion, diarrhea, nausea, and vomiting. (AR 774-77). She was taking Percocet three times daily for her pain. (AR 783). She had recently received hospital outpatient care for anxiety attacks. (AR 774). She admitted to suicidal ideation and a previous addiction to pain medications. (AR 776). She was attending Alcoholics Anonymous meetings to address her non-alcohol addictive issues. (AR 776). She was overwhelmed by her medication situation and bills. (AR 776). Dr. Schultz adjusted her medications and referred her for some laboratory testing. (AR 776).

Brubaker saw Dr. P. Rustagi four times in early 2011. (AR 682-83, 739-41). In February, she complained of panic attacks and suicidal thoughts and had been abusing prescription pain medication. (AR 682). She was diagnosed with a bipolar disorder and assigned a GAF score of 50. (AR 683). In March, Brubaker reported a good response to her current medication regime and that she was complying with her medications. (AR 741). In April, Brubaker reported that she was feeling well and was still complying with her medications. (AR 740). In June, Brubaker reported that life had been going reasonably well for her and that her mood had been fairly content and stable. (AR 739). She had been taking her medications sporadically and thought her mental health was "in good shape," so she wanted to taper off of her medications. (AR 739).

In August 2011, Brubaker was hospitalized for a week due to abdominal pain, chronic pancreatitis, and wall thickening of her colon. (AR 743-47, 770). She had stopped all of her medication five months earlier. (AR 743). She was treated with intravenous narcotic pain

6

management and antiemetics. (AR 747). Brubaker saw Dr. Schultz after she was discharged. (AR 770-73). Brubaker told Dr. Schultz that she had stopped all of her medications five months earlier, and that since that time she has had repeated episodes of abdominal discomfort lasting several days at a time that eventually resolved spontaneously. (AR 770). In the last three weeks, her pain had become more recalcitrant. (AR 770). He recommended that she undergo further consultation and testing. (AR 773).

In September 2011, Brubaker was evaluated by Park Center upon self referral. (AR 950-59). Brubaker admitted a history of misuse of opiate pain medications. (AR 950). She presented with anxiety and depression. (AR 950). She was diagnosed with opioid dependence and cannabis abuse. (AR 957-58). Treatment at Park Center continued through July 2015; Brubaker inconsistently attended treatment, which impacted her progress. (AR 950-67, 1001-32, 1037-74, 1126-71, 1388-1424, 1456-1545). Diagnoses of a bipolar II disorder and a major depressive disorder, single episode, moderate, and an anxiety disorder, NOS, were subsequently added. (AR 1008, 1016, 1171). She was assigned a GAF score of 51 at her initial session, and the GAF score never changed thereafter in the treatment records. (AR 1038, 1066, 1071, 1159, 1165, 1407, 1456, 1485, 1508, 1529).

In November 2011, Brubaker saw Dr. Lehman, reporting a worsening of her chronic pain since weaning herself off of narcotic pain medications. (AR 786). She complained of continuous pain with episodic flare-ups three to seven times a day, which last 30 seconds to two minutes and are alleviated by Vicodin. (AR 786). The pain was waking her at night, and she noticed some chills and night sweats. (AR 786). She had lost 40 pounds and was having anorexia. (AR 786). She was taking Vicodin for breakthrough pain, four to six times a day. (AR 786). Dr. Lehman found that Brubaker's chronic pain had been very well controlled in the

last year until it flared in September. (AR 787). She was not on very high doses of medication at the time. (AR 787). He discussed several options with her, such as admitting her to a hospital and resting her gut, inserting a feeding tube, or continuing with outpatient pain management. (AR 787). She opted to continue with pain management, with a possible referral to a pain management specialist. (AR 787). Dr. Lehman increased Brubaker's Vicodin dosage and instructed her to eat frequent small meals with low fat and to avoid smoking or consuming alcohol. (AR 787).

In December 2011, Brubaker was evaluated by Wayne Von Bargen, Ph.D., at the request of the state agency. (AR 819-21). Dr. Von Bargen assigned her a GAF score of 55 and diagnosed her with a bipolar disorder II, an anxiety disorder NOS, a pain disorder, and opioid dependence. (AR 821). He indicated that "[a]s a worker, her attendance and productivity may be somewhat variable." (AR 821).

Brubaker visited the emergency room four times in 2011 due to abdominal symptoms; she was admitted at two of the visits. (AR 656, 713, 716, 743, 807). Brubaker visited the emergency room five times in 2012 for her abdominal symptoms; she was admitted at one of the visits. (AR 833, 850, 907, 916, 970). Brubaker also saw Dr. Julie Chao for two visits in 2012. (AR 1378-81).

In November 2012, Brubaker was hospitalized for complaints of increased depression and suicidal ideation. (AR 943-44). She had multiple recent stressors, including loss of a job, ending a relationship with her boyfriend, custody issues over her two-year-old son, and abuse of heroin. (AR 943). She was diagnosed with a bipolar disorder, type II, depressed; and opioid dependence. (AR 943). She was much improved upon discharged. (AR 944). Upon discharge, she moved in with her parents. (AR 944).

In May 2013, Kari Kennedy, Psy.D., a state agency psychologist, reviewed Brubaker's record and completed psychiatric review technique and mental RFC forms. (AR 114-19). In the psychiatric review technique, Dr. Kennedy concluded that Brubaker had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (AR 114). In the mental RFC, Dr. Kennedy found that Brubaker was moderately limited in: maintaining attention and concentration for extended periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting. (AR 116-19). Dr. Kennedy concluded:

> [T]he claimant is able to: remain alert and pay close attention to watching machine processes; able to inspect, test or otherwise look for irregularities; able to tend or guard equipment or property, material or persons against loss or damage. [Claimant] may prefer to work in a position that requires minimal interaction with others. [Claimant] appears capable of semiskilled work.

(AR 118).

Also in May 2013, Dr. M. Ruiz, a state agency physician, reviewed Brubaker's record and concluded that Brubaker could lift 25 pounds frequently and 50 pounds occasionally; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and frequently climb, balance, stoop, kneel, crouch, and crawl. (AR 115-16).

In 2013, Brubaker visited the emergency room four times for abdominal symptoms. (AR 980, 1106, 1181, 1237).

In January 2014, Candace Martin, Psy.D., conducted a mental status exam. (AR 1197-1201). Brubaker's attention and concentration were strong, and she was able to attend to task and follow instructions well. (AR 1199). Her social skills and her mentation skills were also

strong. (AR 1199-1200). She had an adequate or good memory. (AR 1199). Her mood was discouraged. (AR 1199). Dr. Martin opined that Brubaker's intellectual functioning would not interfere with her ability to work. (AR 1200). However, Dr. Martin found that Brubaker's bipolar symptoms—poor and excessive sleep, poor appetite, poor attention to her own personal hygiene, lack of attention to chores of responsibility, loss of previous level of social activity, and complaints of problems with memory—"would certainly interfere with her ability to work in a consistent manner." (AR 1200). Dr. Martin assigned her a GAF score of 35 and diagnoses of a bipolar II disorder; an adjustment disorder with depressed mood; substance abuse by report, in remission; and a borderline personality disorder by report. (AR 1201).

Also in January 2014, Ken Lovko, Ph.D., a state agency psychologist, reviewed Brubaker's record and completed psychiatric review technique and mental RFC forms. (AR 129-35). In the psychiatric review technique, Dr. Kennedy concluded that Brubaker had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (AR 130). In the mental RFC, Dr. Kennedy found that Brubaker was moderately limited in: performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting. (AR 132-33). Dr. Lovko concluded:

> The evidence suggests that claimant can understand, remember, and carry-out semiskilled tasks without special considerations in many work environments. The claimant can relate on at least a

> superficial and ongoing basis with co-workers and supervisors.
> The claimant can attend to task for sufficient periods of time to
> complete tasks. The claimant can manage the stresses involved
> with semiskilled work.

(AR 135).

Also in January 2014, Dr. H.M. Bacchus, a state agency physician, examined Brubaker. (AR 1205-06). His impression was a history of chronic pancreatitis with acute flares; a major depressive disorder/bipolar disorder, treated with multiple medications; and anxiety. (AR 1205-06). Dr. Bacchus opined that Brubaker "retain[ed] the physical functional capacity to perform light duties." (AR 1206).

In April 2014, Dr. M. Brill, a state agency physician, reviewed Brubaker's record and concluded that Brubaker could lift 25 pounds frequently and 50 pounds occasionally, stand or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (AR 161-62).

In early 2014, Brubaker saw Dr. H. Ailinani, of Summit Pain Management, four times. In 2014, Brubaker visited the emergency room seven times for abdominal symptoms (AR 1216, 1285, 1297, 1301, 1788, 1810, 1828), and in 2015, Brubaker visited the emergency room 10 times due to abdominal symptoms (AR 1315, 1325, 1336, 1347, 1359, 1844, 1861, 1876, 1892, 1903).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is

currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On October 15, 2015, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 18-29). At step one of the five-step analysis, the ALJ found that Brubaker had not engaged in substantial gainful activity since her alleged onset date. (AR 21). At step two, the ALJ found that Brubaker had the following severe impairments: chronic pancreatic disease, pancreatitis, a bipolar disorder, a borderline personality disorder, depression, anxiety, and an adjustment disorder. (AR 21). At step three, the ALJ concluded that Brubaker did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 22-25). Before proceeding to step four, the ALJ determined that Brubaker's

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

13

symptom testimony was "not entirely credible" (AR 26), and the ALJ assigned her the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except that the claimant can understand, remember, and carry out simple instructions; she can make judgments on simple work-related decisions; she can respond appropriately to supervisors, coworkers, and the general public; she can respond appropriately to usual work situations; and she can deal with changes in a routine work setting free from a production rate pace.

(AR 25).

At step four, the ALJ found that Brubaker was unable to perform any of her past relevant work. (AR 28). Based on the RFC and the VE's testimony, the ALJ concluded at step five that Brubaker could perform a significant number of light-exertional jobs in the economy, including small products assembler, laundry folder, and electrical accessories assembler. (AR 29). Therefore, Brubaker's applications for DIB and SSI were denied. (AR 29).

### C. *The Mental RFC and Step-Five Hypotheticals*

Brubaker argues that the ALJ failed to account for all of her mental limitations when assigning the RFC and when posing hypotheticals to the VE at step five. Specifically, Brubaker argues that the ALJ failed to account for her moderate limitations in performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. (AR 133). Dr. Lovko articulated these limitations in Section I of his mental RFC assessment form. (AR 132). In Section III of the mental RFC assessment form, which is the narrative portion of the form, Dr. Lovko opined that Brubaker could perform semi-skilled tasks without special considerations in many work environments, could attend to task for sufficient

14

periods of time to complete tasks, and could manage the stresses involved with semiskilled work. (AR 135). The Seventh Circuit Court of Appeals has drawn distinctions between the information included in Section I of a mental RFC assessment form, which typically consists of checked boxes, and the information set forth in Section III of the mental RFC assessment form, which is typically a narrative summary of evidence and a conclusion.

In *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015), the Seventh Circuit explained that Section I is "merely a worksheet to aid doctors in deciding the presence and degree of functional limitations." Despite this characterization as a "worksheet," the Court "declined to adopt a blanket rule that checked boxes in Section I of the MRFCA form indicating moderate difficulties in mental functioning need not be incorporated into a hypothetical to the VE." *Id*. Rather, the Court explained that "[w]orksheet observations, while perhaps less useful to an ALJ than a doctor's narrative RFC assessment, are . . . medical evidence which cannot just be ignored." *Id*. The Court further articulated that "in some cases, an ALJ may rely on the doctor's narrative RFC, rather than the checkboxes, *where that narrative adequately encapsulates and translates those worksheet observations*." *Id*. (emphasis added) (citing *Johansen v. Barnhart*, 314 F.3d 283, 286 (7th Cir. 2002)). On at least once occasion, the Seventh Circuit has concluded that a doctor's narrative opinion did not adequately "translate" limitations identified in Section I of the mental RFC form. *See Yurt v. Colvin*, 758 F.3d 850, 858 (7th Cir. 2014).

While it can be argued that Dr. Lovko may have "translated" Brubaker's moderate limitations in performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods, into a mental RFC, Brubaker raises an

15

additional issue of concern in this instance. Brubaker contends, and persuasively so, that the ALJ cherry-picked the evidence to support the assigned mental RFC while ignoring contradictory evidence.

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). Similarly, "[a]n ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing *Myles*, 582 F.3d at 678)). "The ALJ must evaluate the record fairly." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Here, the ALJ failed to mention, much less evaluate, a material portion of the opinion of Dr. Von Bargen, who examined Brubaker in December 2011. While the ALJ penned a paragraph on Dr. Von Bargen's opinion and gave "greater weight" to the GAF score of 55 that he assigned (AR 24), the ALJ never addressed the portion of Dr. Von Bargen's opinion that stated: "As a worker, [Brubaker's] attendance and productivity may be somewhat variable." (AR 821). The Commissioner contends that Dr. Von Bargen's opinion was speculative in nature and also remote in time, given that it was prior to Brubaker's alleged onset date. The Commissioner's arguments would be more persuasive if the ALJ's oversight regarding Dr. Von Bargen's opinion stood alone, but it does not. The ALJ *also* ignored a similar portion of Dr. Martin's opinion.

In that regard, the ALJ penned a paragraph on Dr. Martin's opinion dated January 2014 and the GAF score of 35 that she assigned. (AR 24). The ALJ viewed Dr. Martin's mental

16

status findings as unremarkable in that Brubaker demonstrated good memory functioning and strong mentation skills. (AR 24). The ALJ then assigned Dr. Martin's GAF score of 35 "little weight," in contrast to the "greater weight" that he assigned to Dr. Von Bargen's GAF score of 55 dated two years earlier. (AR 24). In considering Dr. Martin's opinion, however, the ALJ failed to mention, much less discuss, the portion of Dr. Martin's opinion that stated Brubaker's bipolar disorder symptoms—poor and excessive sleep, poor appetite, poor attention to her own personal hygiene, lack of attention to chores of responsibility, loss of previous level of social activity, and complaints of problems with memory—"would certainly interfere with her ability to work in a consistent manner." (AR 1200); *see generally Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (emphasizing that when important evidence is left unmentioned by the ALJ, the Court is "left to wonder whether the [evidence] was even considered").

Thus, while the ALJ did quite thoroughly analyze Brubaker's ability to maintain concentration, persistence, or pace in connection with the performance of simple work (AR 23-24), the ALJ fell short of adequately addressing the evidence pertaining to Brubaker's attendance and punctuality that contradicted her conclusion. Instead, the ALJ seemed to rely heavily on the fact that Brubaker had "worked in the past with the same chronic pancreatitis and bipolar conditions from 2004 to 2006" (AR 26), and that she had a "long, long history of working in spite of having chronic intermittent pancreatitis flares and having mental impairments including a bipolar II disorder" (AR 24).

But Brubaker's attendance problems after her alleged onset date are replete throughout Park Center's records. (AR 1001-32, 1037-74, 1388-1439, 1456-1542). Similarly, her visits to

17

the emergency room after her alleged onset date reflect repeated flare ups of her chronic pancreatitis, some of several days' duration. (AR 907, 980, 1106, 1237, 1216, 1286, 1297, 1301, 1315, 1325, 1336, 1347, 1359, 1788, 1810, 1828, 1844, 1861, 1876, 1892, 1903). She also had a hospitalization for her mental health symptoms during this period. (AR 943). This evidence is demonstrative of the portions of Drs. Von Bargen's and Martin's opinions that the ALJ failed to mention—that is, that Brubaker's ability to attend work in a consistent manner may be materially impacted by the combination of her conditions. *See generally Johnson v. Astrue*, No. 11 CV 6668, 2012 WL 5989284, at *11 (N.D. Ill. Nov. 29, 2012) ("[A]n ALJ cannot rely solely on the claimant's or doctor's hopeful remarks made during better days, but must consider whether the claimant can hold a job even on low days." (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008))).

The ALJ also relied heavily on the fact that Brubaker admitted that she was able to cope with her illnesses and work in the past when she received regular treatment and complied with her medications. (AR 27, 56). However, "an ALJ must approach issues such as treatment and medication with caution when a claimant has a mental illness." *Barnes v. Colvin*, 80 F. Supp. 3d 881, 887 (N.D. Ill. 2015). As the Seventh Circuit has recognized, "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medications or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (citations omitted); *see also Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011); *Barnes*, 80 F. Supp. 3d at 887; *Bradley v. Comm'r of Soc. Security*, No. 3:07-cv-599, 2008 WL 5069124, at *7 (N.D. Ind. Nov. 25, 2008).

Based on the totality of this particular record, the Court concludes that the ALJ's cherry-

picking of the opinions of Dr. Von Bargen and Dr. Martin is an error that must be remedied upon remand. *See Huber v. Berryhill*, – F. App'x –, 2018 WL 2084793, at *3 (7th Cir. May 4, 2018) (remanding case where the ALJ cherry-picked the opinion of an examining doctor by failing to confront the doctor's contrary opinion that the claimant had trouble standing and walking). Accordingly, the Commissioner's final decision will be remanded for further consideration of the medical source opinions and Brubaker's ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms.[7]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Brubaker and against the Commissioner.

SO ORDERED. Entered this 14th day of May 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[7] Because the Commissioner's final decision is being remanded on this basis, the Court need not reach Brubaker's remaining arguments. Having said that, the Court has briefly reviewed the ALJ's credibility determination and encourages the ALJ to revisit his discounting of Brubaker's symptom testimony about her chronic pain, vomiting, and diarrhea based on the fact that she had gained weight, where no doctor had opined that her weight gain was inconsistent with her chronic pancreatitis symptoms. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) (explaining that an ALJ must not succumb to the temptation to pay doctor by independently concluding that certain medical findings are inconsistent with a particular medical diagnosis).